STATE *ex rel.* E.D.S. FEDERAL CORP., *etc.*

*v.*

LEON H. GINSBERG, *Comm'r, Department of Welfare, etc.,*

*et al.*

(No. 14601)

Decided November 6, 1979.

648

*Chauncey H. Browning*, Attorney General, *Victor A. Barone*, Deputy Attorney General, for plaintiff in error.

*G. Thomas Battle, Spilman, Thomas, Battle & Klostermeyer*, for Computer Co.

*Kay, Casto & Chaney, George S. Sharp and Vincent V. Chaney* for defendant in error.

NEELY, JUSTICE:

This is a complicated case about State purchasing which requires the Court to integrate traditional contract law into the State purchasing statutes, *W. Va. Code*, 5A-3-1 *et seq.* In early 1978 the West Virginia Department of Welfare decided to computerize its system for processing medicaid claims. The system was named Medicaid Management Information System (MMIS) and in October 1978, the State publicly advertised for proposals for the design and operation of MMIS. The Request For Proposal prepared by the staff of the Department of Welfare ran to 39 typewritten pages and included appendices three times the size of the formal request. In response to the Request For Proposal, four companies submitted proposals. One was appellee E.D.S. Federal Corporation and another The Computer Company, the eventual recipient of the contract and intervenor in this case. The other two bidding companies are not involved in this litigation and had no further part in the proceedings under consideration here.

This action was originally instituted in the Circuit Court of Kanawha County as a proceeding in mandamus at the relation of E.D.S. Federal Corporation to compel the appellants to deliver to E.D.S. Federal a contract for the MMIS. At the time the original petition was filed in the circuit court no final contract had been executed by any of the appellants with The Computer Company for the MMIS service. During the pendency of the mandamus proceeding the appellants entered into a contract for the MMIS service with The Computer Company. Upon learning of the contract the appellee filed an amended petition which repeated their request for mandamus relief and further requested a declaratory judgment voiding the contract with The Computer Company and an injunction prohibiting the implementation of the State's contract with The Computer Company.

On 5· June 1979 the circuit court by opinion letter found that the bid of The Computer Company was not responsive to the Request For Proposal and that the contract was improper, void, and of no effect. However, the court further found that the appellee's·prayer for a writ of mandamus should be denied and, consequently, E.D.S. Federal was not awarded the contract by court order.

The West Virginia Department of Welfare appealed to this Court and E.D.S. Federal cross appealed asserting that the circuit court should have given E.D.S. Federal the contract. In both the lower court and on appeal E.D.S. Federal alleged that, in fact, they were the lowest responsible bidder. They argue that the *overall* firm fixed price bid submitted by E.D.S. Federal was less than the *overall* firm fixed price bid submitted by The Computer Company or any other bidder because the proposal and bid submitted by The Computer Company was not responsive to the Request For Proposal in that the Request For Proposal contemplated a binding three year contract subject only to the appropriation of funds by the Legislature. The bid submitted by The Computer Company contained a cancellation provision which per-

mitted *either* party to cancel the contract at the end of each year upon 180 days written notice. In oral argument before this Court, however, it was stipulated that the actual *contract* entered into between The Computer Company and the State of West Virginia did not contain a cancellation provision as that provision had been removed during a seven day negotiation period provided in the Request For Proposal.

E.D.S. Federal also alleged that The Computer Company failed to respond to the Request For Proposal because they did not include the cost of printing reports which the request indicated must be submitted to the Department of Welfare. The heart of E.D.S. Federal's case is that notwithstanding the lower processing cost per item of The Computer Company, the additional cost of printing reports, training State personnel, and potentially turning the system over to the State in the event it chose to exercise its option, all made E.D.S. Federal's bid the lowest responsible one. We reverse the lower court and remand with directions to enter judgment on all points for appellants.

The Department of Welfare did not establish detailed specifications for the hardware or the software[1] involved in its Request For Proposal. The Department was soliciting both a specific way to solve its problem and a further definition of the problem. There are many ways to achieve a system for processing medicaid claims. The State's Request For Proposal and subsequent clarification through a question and answer session with repre-

---

[1]"The computer industry can be divided into two basic areas—hardware and software. The hardware segment includes the manufacture of the machines themselves, their component parts, and related peripheral equipment. The software segment of the industry includes everything other than hardware manufacture, and software is generally described as the program which instructs the computer on its function. Computer hardware, on the other hand, is any of a large variety of devices capable of performing mathematical calculations on numbers or magnitudes." R. M. McGonigil, *The Lease of Computer Hardware* in 2. Bigelow Computer Law Service § 3.1 Art. 4 (1978).

sentatives of the bidders on one side and the Department staff on the other gave notice that the purpose of the Request For Proposal was to generate creative alternatives for managing medicaid claims.

The State did, however, set forth certain requirements of a nontechnical nature which it expected to be included in the bidders' proposals which were as follows:

1. The contract would cover a three year period subject to cancellation in the event that the Legislature failed to appropriate money for the MMIS.

2. A fixed bid price based on 2.5 million claims per year would be the basis for evaluation of the cost proposal of the bidder.

3. The fixed price per claim would be constant throughout the initial three-year contract period and the first three-year bid price would be the basis for designation of the low bidder.

4. Following the selection of the low bidder, a period of negotiation would follow to prepare a contract incorporating the bidder's response with any modifications of that response felt necessary by the Department of Welfare.

5. Each contractor would submit a positive statement with respect to his willingness to comply with all requirements set forth in the Request For Proposal and the General Terms and Conditions for Contracts with the State of West Virginia and clearly describe any exceptions or limitations.

Pursuant to the Request For Proposal, each contractor was requested to submit its proposal organized in two separate sections. The first section set forth the hardware, software, and overall method of processing the claims; the second section described the costs. The technical sections of all proposals were opened on 22 November 1978 and the cost sections on 11 December 1978.

An evaluation and selection committee consisting of seven management executives from the Department of

Welfare was appointed to evaluate the proposals. The committee was composed of a cross section of management and technical personnel within the Department and represented a total of 109 man years of experience with the Department of Welfare. In addition the Information Systems Services Division of the State Department of Finance and Administration was consulted in the evaluation of the technical sections of the proposals. The members of the evaluation committee individually reviewed each technical proposal and then met as a group to consider an evaluation report. The unanimous opinion of the committee was that The Computer Company submitted the best technical proposal. The Information System Services Division concurred in the committee's choice of The Computer Company as the best technical proposal.

When the cost sections of the proposals were opened on 11 December 1978, it was determined that The Computer Company's bid was $0.274 per claim or $685,000 per year based on 2.5 million claims per year. E.D.S. Federal's bid was $0.278 per claim or $695,000 per year based on 2.5 million claims per year. The bids of the other two companies were substantially higher. The Computer Company's bid of $0.274 per claim was a fixed price. None of the terms and conditions proposed by The Computer Company changed its per claim bid price and The Computer Company specifically agreed to comply with all requirements of the Request For Proposal subject only to stated exceptions and special provisions spelled out in subsection II-F of its cost proposal, none of which changed the fixed per claim bid price of $0.274.

The cost portion of E.D.S. Federal's proposal provided that: "The proposal and any contract developed as a result of this proposal are subject to the requirements of the RFP *and* to the following conditions." One of the conditions following this statement reads:

*Annual Adjustment of Payment*

An inflation factor has not been included in the EDSF fixed price per claim. EDSF reserves

the right to adjust the bid prices at the end of each year of operation to take into account the effect of inflation and increases in state taxes. The adjustment in price is not to exceed the consumer price index.

The final recommendation of the committee after considering both technical and cost sections of the proposals was that The Computer Company be awarded the contract. The recommendation of the Evaluation and Selection Committee was approved by the Commissioner of Welfare, who then submitted his recommendation to the Commissioner of Finance and Administration, and to the State Purchasing Director. The State Purchasing Director considered a protest lodged by E.D.S. Federal prior to the award of the contract and made an independent cost analysis of the bids with his own staff. Finally the Purchasing Director approved the selection of The Computer Company as the lowest responsible bidder and stated in his testimony that the main factor which influenced his consideration was the fixed, low price based on the anticipated 2.5 million claims per year.

After the selection of The Computer Company as the lowest responsible bidder, and in accordance with the Request For Proposal, there ensued a period of negotiation with The Computer Company concerning the final terms of the contract. This negotiation did not involve The Computer Company's fixed bid price of $0.274 per claim nor did it involve any change in the level or quality of services offered by The Computer Company in its proposal. The final contract which required the approval of the Purchasing Director, the Director of Finance and Administration, and the Attorney General was completed on 28 March 1979. The Computer Company began to perform under the contract until stopped by the actions in the lower court brought by E.D.S. Federal which are the subject of this appeal.

Upon a review of the entire record before us we find that the matter is so complex that we are unable to determine precisely whether the overall cost of E.D.S.

Federal's system versus The Computer Company's system is lower; however, we conclude that this is not the crucial turning point of the case. E.D.S. Federal alleges that the printing and takeover costs which the State would need to bear under The Computer Company's bid but which the State would not need to bear under E.D.S. Federal's bid would make their bid the lowest. The record reflects that the fixed price per unit bid of The Computer Company was $0.004 lower than E.D.S. Federal's and that there was no escalation clause in The Computer Company's bid to compensate for inflation. If the cost of living index were to rise by 10% a year for three years the initial increase in cost would be roughly $68,500 compounded once again the next year.

This Court is composed neither of computer experts nor accountants and we must interpret the record as it is presented to us by counsel. The presentation indicates to us that a reasonable person could not conclusively determine which bid in total is slightly the lower; however, it is obvious that they are very close and the ultimate determination of which is the lower will only be able to be made after three years when inflation is a known quantity and it is determined whether the State will take over the MMIS. Part of the evaluation of the lowest bid involves a subjective prediction of rates of inflation and an estimation of whether the State will be required to pay the take-over costs by virtue of exercising its option. To a great degree, this involves the weighing of apples and oranges, that is inflation clauses versus higher costs for printing and take-over. The crucial distinction is that the non-conforming condition of The Computer Company—the option to cancel—was not mandatory and was eliminated during negotiation. The escalation clause of E.D.S. Federal appeared to be a fixed part of its bid which may not have been removed in negotiation.

## I

The first issue presented to us is whether E.D.S. Federal had standing to sue either in mandamus or for a

declaratory judgment to cause the State to award them the contract. Upon the suggestion of the Department of Welfare in the lower court that E.D.S. Federal lacked standing to sue because they had not brought their action as a taxpayer E.D.S. Federal amended their complaint to assert a cause of action as a West Virginia corporate taxpayer. Their relief in that capacity would be limited to having the contract voided since recent case law holds that there is no standing to demand that the contract be awarded to the lowest responsible bidder. This would clearly follow from *Pioneer Co. v. Hutchinson*, ___ W. Va. ___, 220 S.E.2d 894 (1975) where it is said in syl. pt. 2:

> An unsuccessful bidder has no standing to prosecute an action for an injunction to enjoin a proposed violation of a statute or ordinance requiring contracts to be awarded to the lowest responsible bidder, except where he seeks such relief as a taxpayer.

We have reviewed the policy behind this syllabus point and have concluded that *Pioneer Co., supra* should be overruled in this regard.[2] Although theoretically taxpayers could bring actions to force the State to comply with purchasing statutes, in fact no taxpayer is sufficiently interested to stand the expense and annoyance of prosecuting an action unless he is otherwise involved in the bidding process. Absent a statute permitting it, litigation expenses cannot usually be obtained against the State of West Virginia, and consequently, it is highly unlikely that taxpayers will gratuitously vindicate the public interest. The individual or corporation most likely

---

[2]Under the traditional rule even if the contract is improperly awarded to another the disappointed low bidder could not bring an action because he had no standing to sue, *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940). This rule has recently been relaxed by a number of federal decisions allowing the rejected bidder to sue. *Airco, Inc. v. Energy Research & Development Administration*, 528 F.2d 1294 (7th Cir. 1975); *Cincinnati Electronics Corp. v. Kleppe*, 509 F.2d 1080 (6th Cir. 1975); *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (DC Cir. 1970).

to bring to notice irregularities in contracting procedures is an unsuccessful bidder; unless the unsuccessful bidder can receive relief in the form of compelling the State to award him the contract he also will lack incentive to vindicate public rights. Accordingly we hold today that an unsuccessful bidder who conforms to the requirements set forth in the offer of the State for bids and is the lowest responsible bidder has standing to prosecute an action in mandamus to compel the appropriate State officers to perform their nondiscretionary, mandatory duty of awarding the contract to the lowest responsible bidder, if in the exercise of their discretion they have once determined that a contract shall be awarded at all.[3] However, as contemplated by the statute, where price alone is not the exclusive criterion for award of the contract, an unsuccessful bidder comes to court with the heavy presumption against him, namely that the contracting agency properly exercised its discretion. We hold today that a strong presumption of regularity should replace *Pioneer's* inflexible rule of total lack of standing.

## II

In the case before us we find a rational but complex contracting procedure. The West Virginia Department of Welfare is neither a computer hardware nor software manufacturer; it is in the welfare business and not the computer business. While the Department of Welfare recognized that it had a problem managing Medicaid claims, it was not sufficiently conversant with the extent and nature of its own information management problem to know the problem's solution. Accordingly the Department of Welfare did not ask exclusively for hardware and software to do a particular job; rather, it invited technical experts to evaluate the entire problem and to recommend a solution. It was contemplated in the Request For Proposal that the solution might very well entail a redefinition of the problem.

---

[3]Under *W. Va. Code,* 5A-3-14 [1969], "[a]ny or all bids may be rejected."

It might be instructive to analogize the case before us to a simpler problem which could arise in a State hospital. If the State Department of health were to request bids for the delivery of one crate of U.S. Government Grade A eggs to Weston State Hospital every Monday morning the specifications would be sufficiently definite that only price and reliability need be considered. On the other hand, if the Department of Health requested a proposal for the overall feeding of inmates at Weston State Hospital, price alone would not be the only criterion. Let us assume that two proposals were received: the first proposal set a price of $2.19 per inmate per day with a menu dependent upon heavy starches including a meat meal three times a week; the second proposal set a price of $2.50 per inmate per day and included a roast beef or chicken meal on Sundays along with one meat meal every weekday. Certainly under these conditions the Department of Health would be entitled to consider the second proposal the better bid notwithstanding its slightly higher per unit price. This is exactly the type of evaluation process which occurred in the case before us.

This case cannot be analyzed under traditional principles of contract law since the Request For Proposal is only an invitation for an offer, but it may be seen as a quasi-offer under the statutory scheme. In agreeing to abide by the rules set out in the Department of Welfare's Request For Proposal, the bidders proposal, by necessary implication, incorporated all the terms and conditions which are contained in the invitation to bid. The Department of Welfare's quasi-offer, its Request For Proposal, disclaimed any intent that the bidder's quasi-acceptance, its bid, would be binding without an opportunity for further negotiation. The Department of Welfare specifically disclaimed any obligation to accept a proposal with the lowest price tag. Section 2 of the Request For Proposal under the general heading "Acceptance of Proposal" read as follows:

> The Department need not select the lowest bid price, but will select the proposal which offers the best possible system at the most reasonable cost.

Obviously this gave notice to all bidders that there would be a subjective evaluation of the overall system and that price alone would not be the exclusive criterion for the award of the contract.

E.D.S. Federal alleges that The Computer Company's bid condition that the contract be susceptible to termination upon 180 days' notice by either party made The Computer Company's bid unresponsive. In this regard the bid is somewhat ambiguous because at another place in The Computer Company's bid it asserted that it was willing to comply with any and all terms of the Request For Proposal, one of which was that the contract be firm for three years conditioned only upon appropriation of adequate funds by the West Virginia Legislature. The ambiguity was, in fact, resolved when the actual contract entered into by The Computer Company with the State did not contain the cancellation provision; furthermore, lest we give E.D.S. Federal's lawsuit credit for excising this clause from the final contract, we should note that it was for this very purpose that there was the provision in the request which allowed the seven day negotiation period. We recognize that such a clause in the hands of persons bent on fraud could indeed work a substantial injustice upon honest bidders because a bid could be accepted at a seemingly low price only to be raised by private negotiations. In this case, however, there is not even the suggestion of fraud or collusion. The actual contract into which the State and The Computer Company entered eliminated any disparities between the request and the bid.

All reading of the statutory scheme for State purchasing suports the conclusion that it was never contemplated that price alone be the exclusive criterion by which State contracts are awarded. In this regard *W. Va. Code,* 5A-3-14 [1972] provides:

> All open market orders, purchases based on advertised bid requests, or contracts made by the director or by a state department shall be award-

ed to the lowest responsible bidder, taking into consideration the qualities of the articles to be supplied, their conformity with specifications, their suitability to the requirements of the state government and the delivery terms.

Consequently the statute itself contemplates a subjective evaluation of such things as quality, compatibility with other State facilities, and service in addition to price.

### III

The Court's opinion in this case is strengthened by the enormous level of objectivity with which the Department of Welfare evaluated the bid proposals and the care with which State officials exercised their discretionary powers. There is no question that a bidder who goes to the expense of preparing a complex proposal has a right to rely upon both the contracting authority's integrity and intelligent use of discretion. It would be poor public policy, however, to encourage frivolous challenges to the award of every contract in which there is the slightest dispute about either price or quality. From this fear emanated syl. pt. 2 of *Pioneer Co. v. Hutchinson, supra*, which we have already concluded to be an over-reaction to the potential problem. We hold that fraud is always grounds for bringing an action in mandamus against State officials in contract cases. Furthermore we hold that if a contractor has been encouraged to rely to his detriment by State officials and has undertaken the expense to submit a low, responsible bid which is then rejected by reason of outrageous abuse of discretion, the bidder also has grounds for relief. However, disputes over pennies should be left to the market place and the lower courts should be quick to dispose of frivolous cases where protracted litigation will grind the wheels of government to a halt. Certainly State officials are not required to accept the lowest price where service, delivery dates, continuity in supply, and other factors not directly related to cost are involved, particularly where these elements have a far greater impact upon the efficiency of State government than minor differences in price.

Nor is the State required to accept the lowest bid if the bidder is not "responsible" within the contemplation of *W. Va. Code,* 5A-3-14 [1972].

The Court is troubled by the potential for litigation where a contracting agency legitimately predicates its award of a contract on criteria other than price, yet we are reluctant to avoid one evil by denying access to the courts along the lines articulated in *Pioneer v. Hutchinson, supra* lest we foster a new evil, namely cavalier disregard for the public's interest in efficient public expenditures. Consequently, when the State finds that criteria other than price militate in favor of accepting a higher bid the wisest course, particularly when litigation is anticipated, is to file a written opinion along with the bid award setting forth the criteria relied upon in awarding the contract. If, for example, a State agency has had experience with the low bidder before which demonstrates great unreliability of delivery dates, that fact should be set forth in the opinion. While such an opinion is not mandatory, it is enormously useful to a trial court attempting to understand the motivation of the contracting authority; since great discretion is reposed in the contracting authority by statute, the courts should not guarantee any particular result, but rather only the rationality of the process by which the results are determined and the fidelity with which the contracting authority is following the statutory directives. *See Citizens Bank of Weirton v. West Virginia Board of Banking and Financial Institutions,* ___ W. Va. ___, 233 S.E.2d 719 (1977).

Where the State is involved in an enormously complex problem, the full extent of which the contracting authority recognizes as being undefined, the State may do exactly what was done in this case, namely set out a Request For Proposals which does not have definite specifications. This is an emminently rational, cheap, and efficient method of evaluating alternate approaches to a given problem and for selecting both objectively and subjectively the best overall solution. It should be obvious to any bidder that objective and subjective evalua-

tion processes will be used together to determine the lowest responsible bidder and proposals must be submitted bearing that risk in mind.

Accordingly for the reasons set forth above the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded to the circuit court with directions to enter judgment on all issues in favor of the appellants.

*Reversed and remanded with directions.*